## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| PRATIK KANDEL, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>  v.<br><br>EROS MEDIA WORLD PLC and EROS INTERNATIONAL USA INC.,<br><br>        Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Dated: February 16, 2023

**BURSOR & FISHER, P.A.**
Yitzchak Kopel
888 Seventh Avenue
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: ykopel@bursor.com

*Attorneys for Plaintiff*

1

## TABLE OF CONTENTS

NATURE OF THE ACTION ........................................................................1

FACTUAL BACKGROUND.......................................................................3

    I.      HISTORY AND OVERVIEW OF THE VPPA ...................................3

    II.     DEFENDANTS ARE VIDEO TAPE SERVICE PROVIDERS ..........4

    III.   DEFENDANTS VIOLATES THE VPPA BY KNOWINGLY DISCLOSING APP USER'S PII TO THIRD PARTIES ....................6

        A.    Testing Reveals That Defendants Illegally Share App Users' PII Viewing Information With A Third Party, WebEngage ........................................................................6

             1.    Overview Of The WebEngage API .................................8

             2.    Defendants Disclose Information Sufficient To Enable An Ordinary Person To Identify Which Specific Consumers Watched Which Specific Videos ........................................................................9

        B.    Defendants Disclose Their Consumers' PII To WebEngage In Order To Analyze App Metrics And Maximize Advertising And Marketing Revenue....................13

        C.    Defendants Intentionally And Knowingly Disclose Their Consumers' PII To WebEngage ................................24

    IV.    EXPERIENCE OF PLAINTIFF PRATIK KANDEL ........................27

PARTIES....................................................................................................28

JURISDICTION AND VENUE .................................................................28

CLASS ALLEGATIONS ...........................................................................29

CAUSES OF ACTION ..............................................................................32

    VIOLATION OF THE VPPA, 18 U.S.C. § 2710 ........................32

PRAYER FOR RELIEF ............................................................................35

JURY DEMAND .......................................................................................35

Plaintiff Pratik Kandel ("Plaintiff"), individually and on behalf of all other persons similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.    This is a class action suit against Defendants Eros Media World plc ("EMW") and Eros International USA Inc. ("Eros USA") (collectively, "Eros" or "Defendants") for violations of the Video Privacy Protection Act ("VPPA").

2.    Defendant EMW develops, owns, and operates a mobile application, titled "Eros Now" ("Eros Now App" or the "App"), which, as Defendants describe it, is

> a leading Indian OTT platform[1] with over 224.0 million registered users and 39.9 million paying subscribers. It offers endless entertainment hosting one of the largest movie libraries (over 12,000 digital titles), as well as premium television shows, music and music videos, unmatched in quantity and quality. Eros Now also has a deep library of short-form content, totaling over

---

[1] An "OTT platform"—which is short for "over the top platform"—refers to "any type of video or streaming media that provides a viewer access to movies or TV shows by sending the media directly through the internet." 5 THING YOU NEED TO KNOW ABOUT OVER THE TOP SERVICES, https://www.mdtc.net/5-things-to-know-about-over-the-top-services/. In other words, an OTT platform is a streaming service like "Netflix, Amazon Prime Video, and Hulu." *Id*.

4,400 short-form videos including trailers, original short exclusive interviews and marketing shorts.[2]

3.     The US-based operations of the Eros Now App are managed by Eros USA.

4.     Unbeknownst to Plaintiff and members of the Class, however, Defendants knowingly and intentionally disclose their users' personally identifiable information—including a record of every video viewed by the user—to unrelated third parties.

5.     The United States Congress passed the VPPA in 1988, seeking to confer onto consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers." S. Rep. No. 100-599, at 8. "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent." *Id.*

6.     The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710. "Personally identifiable information" ("PII") is defined as "information which identifies a person as having

---

[2] EROS NOW, https://www.erosmediaworld.com/global-brands/eros-now/.

requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

7.     Plaintiff brings this action for damages and other legal and equitable remedies resulting from Defendants' violations of the VPPA.

## FACTUAL BACKGROUND

### I.     HISTORY AND OVERVIEW OF THE VPPA

8.     The impetus for the VPPA begins with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court.  During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper which then published that history.  Congress responded by passing the VPPA, with an eye toward the digital future.  As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Pratik Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home.  In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone.  I think that is wrong.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

9.     In 2012, Congress amended the VPPA, and in so doing, reiterated the Act's applicability to "so-called 'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop

computers, and cell phones." S. Rep. 112-258, at 2.

10.    The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1).  The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3).  A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

## II.    DEFENDANTS ARE VIDEO TAPE SERVICE PROVIDERS

11.    Defendant EMW develops, owns, and operates the Eros Now App.  The US-based operations of the Eros Now App are managed by Defendant Eros USA, which is a subsidiary of Defendant EMW.

12.    Consumers can download the Eros Now App through the Google Play Store on Android devices or the Apple App Store on iOS devices.

13.    The App provides three options for consumers in terms of accessing video content.  *First*, a consumer can access the App for free without creating an account, which allows access to only a limited subset of video content such as "quickie original" web series and music videos.  *Second*, a consumer can create a

4

free account, which allows access to more video content, but not all video content that the App has to offer.  For instance, a consumer with a free account can watch the first episode of a TV show on the App, but not every episode of every season of that TV show.  And *finally*, a consumer can sign up for an Eros Now Premium subscription, which allows access to full-length movies and TV shows, as well as every episode of every season of the TV shows on the App.

14.    Regardless of the option a user chooses, the Eros Now App provides users with a host of video content, including Bollywood movies, TV shows, and short-form video content, including original content produced by Defendant.[3]

15.    Indeed, as alleged above, Defendants extol the fact that the Eros Now App provides extensive video content to consumers, writing on their website that the Eros Now App

> offers endless entertainment hosting one of the largest movie libraries (over 12,000 digital titles), as well as premium television shows, music and music videos, unmatched in quantity and quality.  Eros Now also has a deep library of short-form content, totaling over 4,400 short-form videos including trailers, original short exclusive interviews and marketing shorts.[4]

16.    Defendants also reap massive financial benefits from the video content it delivers on the App.  The Eros Now App has over "224.0 million registered users

---

[3]  *See* EROS NOW – MOVIES, ORIGINALS, https://play.google.com/store/apps/details?id=com.erosnow&hl=en_US&gl=US.

[4]  EROS NOW, https://www.erosmediaworld.com/global-brands/eros-now/.

and 39.9 million paying subscribers."[5]  Just on Android devices alone, the App has been downloaded over 10 million times.[6]

17.    At no point do Defendants receive permission from users to share their location information, personally identifiable information, or video viewing information with third parties.

## III.    DEFENDANTS VIOLATES THE VPPA BY KNOWINGLY DISCLOSING APP USER'S PII TO THIRD PARTIES

### A.    Testing Reveals That Defendants Illegally Share App Users' PII Viewing Information With A Third Party, WebEngage

18.    In the Fall of 2022, Plaintiff's counsel retained a private research company to conduct a dynamic analysis of the Eros Now App.  A "dynamic analysis" records the transmissions that occur from a user's device.

19.    The researchers analyzed the disclosures made from Eros Now to third parties when watching an episode of a TV show that was available to both free and premium App account users.  This analysis revealed that Defendants transmit to a third party information sufficient to identify specific Class members and the specific videos they watch.

---

[5] *Id*.

[6]  Eros Now – Movies, Originals, https://play.google.com/store/apps/details?id=com.erosnow&hl=en_US&gl=US.

20.    The analysis first established that Defendants incorporate multiple "application programming interfaces" ("APIs") into its App.

21.    APIs "enable[] companies to open up their applications' data and functionality to external third-party developers, business partners, and internal departments within their companies."[7]

22.    Defendants integrate into the App the WebEngage API, an API owned and operated by a company of the same name.

23.    The dynamic analysis found that Defendants discloses to WebEngage, through the WebEngage API, information sufficient to permit an ordinary person to identify a specific person's video-viewing behavior, for all person that create accounts, regardless of whether they create a free account or sign up for a paid subscription to the App.  Specifically:

- When a user creates a free App account, Defendants disclose to WebEngage, through the WebEngage API, at least the following identifiers: (i) a user's full name; (ii) a user's e-mail address; (iii) a user's date of birth; (iv) the title of the TV show, movie, or short series watched by the user, and, if applicable; (v) the specific episode of the TV show or short series watched by the user.

- When a user created a paid App account (*i.e.*, signs up for an "Eros Now Premium" subscription), Defendants disclose to WebEngage, through the WebEngage API, at least the following identifiers: (i) a user's full name; (ii) a

---

[7] IBM CLOUD EDUCATION, APPLICATION PROGRAMMING INTERFACE (API), https://www.ibm.com/cloud/learn/api.

user's date of birth; (iii) the title of the TV show, movie, or short series watched by the user, and, if applicable; (iv) the specific episode of the TV show or short series watched by the user.

24.    For both free and paid App accounts, the dynamic analysis also found that Defendants disclose to WebEngage, through the WebEngage API, (i) a user's unique user ID; (ii) the unique video ID associated with the TV show, movie, or short series watched by the user; and, if applicable, (iii) the unique video ID associated with the specific episode of the TV show or short series watched by the user

### 1.    Overview Of The WebEngage API

25.    When developers build a mobile application, they typically outsource particular functions, like marketing, advertising, and analytics, to third party providers.  WebEngage is one such third party.

26.    WebEngage is "[a] robust customer data platform, personalization engine, omnichannel campaign manager, and an analytics engine all baked into one seamless full-stack Retention OS."[8]

27.    In plain English, once integrated into a developer's mobile application, the WebEngage API allows an app developer to, among other features, conduct real-

---

[8] WEBENGAGE, https://webengage.com/.

time targeted marketing,[9] analyze app data in real time,[10] send personalized advertisements and offers to mobile users,[11] and to even "[i]nfluence [o]ngoing user [b]ehaviour" "using real-time personal & behavioral customer data."[12]

28.    As alleged in greater detail below, Defendants utilize each and every one of these features of the WebEngage API, and sends App users' PII to WebEngage through the WebEngage API in order to assist with Defendant's marketing, advertising, and analytics efforts.

> 2.    *Defendants Disclose Information Sufficient To Enable An Ordinary Person To Identify Which Specific Consumers Watched Which Specific Videos*

29.    The VPPA prohibits the disclosure of a consumer's "personally identifiable information" ("PII") to a third party.  18 U.S.C. § 2710(b)(1).  The VPPA defines "personally identifiable information" as "information which identifies a [specific] person as having requested or obtained specific video materials or services from a video tape service provider."  18 U.S.C. § 2710(a)(3).  In addition, the Third Circuit has held that PII "means the kind of information that would readily permit

---

[9] CUSTOMER SEGMENTATION, https://webengage.com/customer-segmentation/.

[10]  PRODUCT AND REVENUE ANALYTICS,  https://webengage.com/product-and-revenue-analytics/.

[11]  APP PERSONALIZATION,  https://webengage.com/app-personalization/;  *see also* CAMPAIGN ORCHESTRATION, https://webengage.com/campaign-orchestration/.

[12] LIVE SEGMENTATION, https://webengage.com/customer-segmentation/live/.

an ordinary person to identify a specific individual's video-watching behavior." *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 290 (3d Cir. 2016). The information Defendants discloses to WebEngage via the WebEngage API easily satisfies this definition.

30.     As to the "specific individual," the dynamic analysis found that when a user creates a free or paid App account and watches a video on the App, Defendants disclose to WebEngage via the WebEngage API the user's full name, date of birth, and gender, among other identifiers. The dynamic analysis also found that when a user creates a free App account and watches a video on the App, Defendants also disclose to WebEngage via the WebEngage API the user's e-mail.

31.     These disclosures are shown in the below excerpt of network traffic that is transmitted by Defendants to WebEngage via the WebEngage API when a user with a free account watches a video (the network traffic for a paid account would be identical other than the transmission of an e-mail). The disclosures indicate the identity of the user who watched the video:

//

//

//

//

//



32.    As to the "specific video material," the dynamic analysis found that when a user creates a free or paid App account and watches a video on the App, Defendants disclose to WebEngage via the WebEngage API (i) the title of the TV show, movie, or short series watched by the user, (ii) if applicable, the specific episode of the TV show or short series watched by the user, and (iii) a description of the TV show episode, movie, or short series watched by the user.

33.    These disclosures are shown in the below excerpt of network traffic that is transmitted by Defendants to WebEngage via the WebEngage API when a user with a free account watches a video (the network traffic for a paid account would be identical). The disclosures indicate the specific video watched by the user:



34.    The above-pictured excerpts of network traffic were sent simultaneously by Defendants to WebEngage via the WebEngage API. Thus, when a user with either a free or premium account watches a video on the App, information identifying the specific user is sent simultaneously with information identifying the specific video watched by that user by Defendants to WebEngage via the WebEngage API.

35.    The information described above readily permits an ordinary person to identify the specific video watched by a specific user.

36.    As alleged more fully below, Defendants disclose this PII to WebEngage, through the WebEngage API so WebEngage can help Defendants maximize marketing and advertising revenue and conduct app analytics.

**B.    Defendants Disclose Their Consumers' PII To WebEngage In Order To Analyze App Metrics And Maximize Advertising And Marketing Revenue**

37.    Defendants transmit an App user's full name—and e-mail address in for users with free App accounts—and video viewing information to WebEngage via the WebEngage API in order to analyze App metrics and boost revenue through customized advertising and marketing.

38.    As alleged above, the WebEngage API is "[a] robust customer data platform, personalization engine, omnichannel campaign manager, and an analytics engine." By collecting user data, WebEngage promotes that companies will be able to "Bring Data and Analytics to the Fore-front and Skyrocket Your Revenue Growth."[13]

39.    WebEngage's data collection initially begins anonymously through an "LUID," and all actions associated with this LUID are detailed under an "Unknown User Profile." However, once a user performs an action "that enables you to identify them," such as logging into an account, the user will be assigned a CUID. And all user actions associated with this CUID will then be detailed under a "Known User" profile, which allows for the identification of that user:

---

[13] WEBENGAGE, https://webengage.com/.



40.    Once a user has been identified by WebEngage—as any user of the App who creates an account would be—Defendants can then analyze that user's deanonymized App activity and target the user with specific marketing and advertising.

41.    As to analytics, WebEngage touts that it provides "real-time analytics for accelerated growth," noting that its API helps app developers "uncover" "everything about your users."[14]

---

[14]    PRODUCT AND REVENUE ANALYTICS, https://webengage.com/product-and-revenue-analytics/.

42.    Specifically, WebEngage allows companies like Defendants to get "[m]inute-by-minute" "[i]nsights into users who are currently active on your app and website,"[15] such as analyzing the actions users took on an app or website and comparing user trends over time[16] or "understand[ing] what actions your users take before they uninstall your mobile app" so as to prevent uninstalls.[17]

43.    By collecting these app analytics, companies like Defendants can (and do) utilize this data to improve its marketing and advertising efforts, another feature WebEngage assists with. For instance, by utilizing WebEngage's live analytics, WebEngage allows companies conduct targeted marketing in real-time "based on real-time user information and behavioral data."[18]  Indeed, WebEngage goes as far as to say companies who use its API can "[i]nfluence ongoing user behavior with real-time segmentation."[19]

---

[15]  LIVE ANALYTICS, https://webengage.com/product-and-revenue-analytics/live-analytics/.

[16]  PATHS, https://webengage.com/product-and-revenue-analytics/paths/.

[17]  UNINSTALLS, https://webengage.com/product-and-revenue-analytics/uninstalls/.

[18]  CUSTOMER SEGMENTATION, https://webengage.com/customer-segmentation/.

[19]  LIVE SEGMENTATION, https://webengage.com/customer-segmentation/live/.

44.    WebEngage also allows companies to "[e]nrich campaigns with key profile information like Name, Gender, Birthdate, Education, etc.," among other types of user data.[20]



*WebEngage promotional graphic used for the proposition that companies who use the WebEngage API can "[u]se customer attributes, behavioral data, and other derived insights to create static customer segments."*

---

[20]  *Id.*; *see also* CUSTOMER SEGMENTATION, https://webengage.com/customer-segmentation/ (noting companies that use the WebEngage API can "[u]se customer attributes, behavioral data, and other derived insights to create static customer segments").

45.    Notably, Defendants' App collects this very information name, birthdate, gender, and e-mail in certain cases) and transmits it to the WebEngage API.

46.    Similarly, WebEngage allows companies like Eros to "[u]se real-time customer data … to create hyper-personalized in-app notifications" for advertising purposes[21]:



*WebEngage promotional graphic used for the proposition that companies who use the WebEngage API can "[u]se real-time customer data from your systems to create hyper-personalized in-app notifications."*

---

[21]    IN-APP NOTIFICATIONS, https://webengage.com/app-personalization/in-app-notifications/; *see also* TRACKING USERS, https://docs.webengage.com/docs/android-tracking-users.



*Screenshot of WebEngage dashboard, which WebEngage uses to demonstrate that companies who send data to WebEngage "can use this data to personalize your campaigns."*

47.     Once all of this data is collected by WebEngage, the WebEngage API allows companies like Defendants to use the data to create "user profiles to understand everything from demographic data, behavior, attributes, reachability, etc. to run targeted campaigns for the right set of users" and give companies like Defendants "[t]he most comprehensive view of all your user data and events"[22]:

---

[22] OMNICHANNEL MARKETING AUTOMATION TOOL FOR DATA-DRIVEN MARKETING TEAMS, https://webengage.com/marketing-automation/.



48.     WebEngage summarizes the above allegations and the extent of its capabilities in a video entitled "Hyper Personalization in Campaigns With WebEngage: Our How-To Video."[23]   The video illustrates the ease with which companies like Eros can set up "deep data personalization in [] engagement campaigns" by disclosing PII to WebEngage:

---

[23] HYPER PERSONALIZATION IN CAMPAIGNS WITH WEBENGAGE: OUR HOW-TO VIDEO, https://www.youtube.com/watch?v=IoQgFjj0S5k.



49.     The video touts that WebEngage brings companies the "best in class suite" that allows companies like Defendants to "personalize [] campaigns in ways you've always imagined."  For instance, by sending deanonymized consumer data to WebEngage, companies like Defendants can send personalized push notifications to users who perform a certain action on a mobile application, such as adding an item to a shopping cart or, in Defendants' case, watching a certain video:

//

//

//

//

//

//



50.    Notably, companies like Defendants can select from a "plethora of variables" (*i.e.*, data) provided to WebEngage when personalizing these complaints, including the PII Defendants provide to WebEngage here (full name, e-mail, gender, birth date):



51.     WebEngage's video presentation goes on to note that "as long as we're tracking the relevant user related data—their profile attributes, events, and event attributes—all of that data is at your fingertips in the personalization menu when creating campaigns":



52.     As the video presentation notes, WebEngage stores, at a minimum, "user profile data, event data, and [user] attributes":

//

//

//

//

//

//

22



53.    On top of this, the video presentation notes that WebEngage can collect and aggregate data from other third party APIs used by companies in order to better assist with analytics, advertising, and marketing, such as by "using [third party data] in campaigns inside a [user] journey":



54.    Defendants use each and every one of the above-mentioned features of the WebEngage API in Defendants' integration of the WebEngage API into Defendants' App.  Thus, Defendants utilize the WebEngage API to analyze user data, launch marketing campaigns, and target specific users or specific groups of users for advertisements.  All of this, especially in conjunction with WebEngage's marketing and advertising services, helps Defendants further monetize the App and maximize revenue by collecting and disclosing as much PII as possible to WebEngage via the WebEngage API.

### C.    Defendants Intentionally And Knowingly Disclose Their Consumers' PII To WebEngage

55.    Based on the above, it is abundantly clear that Defendants ***intentionally*** and ***knowingly*** discloses to WebEngage, through its WebEngage API, its users' personally identifiable information.

56.    Defendants dispel any doubts about their intentional and knowing disclosure of PII to WebEngage by appearing in WebEngage's case studies and podcasts.

57.    For instance, Eros Interntional's[24] Chief Marketing Officer, Manav Sethi, was quoted in an article created by WebEngage as saying:

> The largest focus for us at Eros is retention instead of acquisition. We are trying to identify the right cohort and target them with the

---

[24] Eros International is the Indian parent company of Defendant Eros USA and a subsidiary of Defendant EMW.

appropriate messaging. In terms of messaging, we are portraying sensitivity and addressing the issue with our users proactively.[25]

58.    WebEngage defines "cohort" as "a group of people who have a unified experience within a specified time frame," specifically linked together by demographic traits and specific actions.[26]  So for instance, a "cohort" could be "all men above the age of 30 who watched a specific episode of TV show" on Defendants' App.  And, as alleged above, WebEngage allows for detail analytics and hyper-targeted marketing and advertising to these cohorts.

59.    Thus, Defendants admit in this article that they intentionally and knowingly uses WebEngage to target cohorts of its users "with the appropriate messaging," which Defendants are able to accomplish by disclosing PII to WebEngage.

60.    Mr. Sethi's engagement with WebEngage is not a one-off instance. Indeed, Mr. Sethi appeared prominently in an episode of WebEngage's podcast, EngageCast[27]:

---

[25] USER ENGAGEMENT, 50+ MARKETING EXPERTS REVEAL THEIR BEST CUSTOMER ENGAGEMENT STRATEGY TO FIGHT THE IMPACT OF COVID, https://webengage.com/blog/best-customer-engagement-strategies/.

[26] COHORTS, https://knowledgebase.webengage.com/docs/cohorts.

[27] *Episode 2: Rewriting the Marketing Playbook for 2020 & Beyond | Manav Sethi*, ENGAGECAST (June 5, 2020), https://webengage.com/resource/podcast/engagecast-specialedition-manav-sethi-erosnow/.



61.     During the podcast, Mr. Sethi tacitly acknowledges that Defendants disclose personally identifiable information to WebEngage, stating that "it is imperative for a marketing team to really look at, or keep continuing to look at, the data that the platform and the ecosystem at large is presenting back."

62.     Mr. Sethi's involvement with the podcast further establishes that Defendants knew WebEngage's capabilities and what information it collected.

63.     Further, common sense dictates that a sophisticated media conglomerate like Eros who includes an API in their App focused on marketing, advertising, and analytics are fully aware of the scope of the data WebEngage is collecting, and are choosing to intentionally provide that data to WebEngage.

## IV.    EXPERIENCE OF PLAINTIFF PRATIK KANDEL

64.    In or about June 2021, Plaintiff downloaded the Eros Now App on his Android phone.  When Plaintiff downloaded up the Eros Now App, he initially created a free App account.  Approximately one week later, Plaintiff signed up for a premium (paid) App account.

65.    Plaintiff has used the App since June 2021.  During that time, he used the Eros Now App to watch various Bollywood movies.

66.    At all times relevant, Plaintiff never consented, agreed, nor otherwise permitted the Eros Now App to disclose his PII to third parties.

67.    Likewise, Defendants never gave Plaintiff the opportunity to prevent the Eros Now App from disclosing his PII to third parties.

68.    Nevertheless, each time Plaintiff viewed a video using the Eros Now App, Defendants disclosed Plaintiff's PII to WebEngage via the WebEngage API. Specifically, Defendants disclosed Plaintiff's full name, e-mail address, gender, date of birth, and video-viewing information—including the full names of movies watched by Plaintiff and descriptions of those movies.  Using this information, WebEngage was able to identify Plaintiff and attribute his video viewing records to an individualized profile of Plaintiff in WebEngage's database.  Indeed, even an ordinary person could identify Plaintiff using the data Defendants disclosed to WebEngage.  Plaintiff's PII was also used to create a user profile that included

Plaintiff's activity on the App, which Defendants use for marketing, advertising, and analytics purposes.

## PARTIES

69.     Plaintiff Pratik Kandel is, and has been at all relevant times, a resident of Nebraska and has an intent to remain there, and is therefore a citizen of Nebraska.

70.     Defendant Eros Media World plc is an Indian corporation whose principal place of business in the United States is located at 550 County Avenue, Secaucus, NJ 07094.  Defendant EMW develops, owns, and operates the Eros Now App, which is used throughout the United States.

71.     Defendant Eros International USA Inc. is a Delaware corporation with its principal place of business at 550 County Avenue, Secaucus, NJ 07094. Defendant Eros USA is a subsidiary of Defendant EMW, and Defendant Eros USA manages the US-based operations of the Eros Now App.

## JURISDICTION AND VENUE

72.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the VPPA).

73.     This Court also has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendants.

74.    This Court has personal jurisdiction over Defendants because Defendant EMWs' principal place of business in the United States is in New Jersey, and Defendant Eros USA's principal place of business is in New Jersey.

75.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant EMWs' principal place of business in the United States is in this District, and Defendant Eros USA's principal place of business is in this District.

## CLASS ALLEGATIONS

76.    **Class Definition:**  Plaintiff seeks to represent a class of similarly situated individuals defined as all persons in the United States who created either a free App account or premium (paid) App account and watched videos on the App (the "Class").

77.    Subject to additional information obtained through further investigation and discovery, the above-described Class may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

78.    **Numerosity (Fed. R. Civ. P. 23(a)(1)):**  At this time, Plaintiff does not know the exact number of members of the aforementioned Class.  However, given the popularity of Defendants' App, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

79.    **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):**  There is a well-defined community of interest in the questions of law and

fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

    (a)    whether Defendants collected Plaintiff's and the Class's PII;

    (b)    whether Defendants unlawfully disclosed and continue to disclose their users' PII, including their video viewing records, in violation of the VPPA;

    (c)    whether Defendants' disclosures were committed knowingly; and

    (d)    whether Defendants disclosed Plaintiff's and the Class's PII without consent.

80.    **Typicality (Fed. R. Civ. P. 23(a)(3)):**  Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, created an account on the Eros Now App (both a free account and a paid account) and used the Eros Now App to watch videos.

81.    **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the VPPA and its analog state laws.  Plaintiff and his counsel are committed to vigorously prosecuting this class action.  Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Class.  Neither Plaintiff nor his counsel have any interest adverse to, or in conflict with, the interests of the absent members of the

Class.  Plaintiff has raised viable statutory claims, or the type reasonably expected to be raised by members of the Class, and will vigorously pursue those claims.  If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Class, additional claims as may be appropriate, or to amend the definition of the Class to address any steps that Defendants took.

82.    **Superiority (Fed. R. Civ. P. 23(b)(3)):**  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class is impracticable.  Even if every member of the Class could afford to pursue individual litigation, the court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.  Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.  By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Class.  Plaintiff anticipates no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE VPPA,
### 18 U.S.C. § 2710

83.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

84.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendants.

85.    Defendants are "video tape service providers" as defined by the VPPA because they "engage in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4), inasmuch as they provide video content (*i.e.*, "similar audio visual materials" under the VPPA's definition) to consumers via their Eros Now App.

86.    Plaintiff and Class members "consumers" as defined by the VPPA because they downloaded, installed, and watched videos using the Eros Now App, and Plaintiff and Class members created either a free or paid Eros Now App account. 18 U.S.C. § 2710(a)(1).  Under the VPPA, therefore, Plaintiff and Class members were "subscribers" of "goods or services from a video tape service provider."  18 U.S.C. § 2710(a)(1).

87.    Plaintiff and Class members viewed videos using the App.  During these occasions the App disclosed Plaintiff's and Class members' PII—including but not limited to Plaintiff's and Class members' (i) full name, (ii) e-mail address (in the case of free App account users), (iii) the title of the TV show, movie, or short series watched by Plaintiff and Class members, and (iv) the specific episode of the TV show or short series watched by Plaintiff and Class members (as applicable)—to WebEngage via the WebEngage API.

88.    The Eros Now App's transmissions of Plaintiff's and Class members' PII to WebEngage via the WebEngage API constituted the "knowing[] disclosure[]" of their "personally identifiable information" to a third party as proscribed by the VPPA.  18 U.S.C. § 2710(a)(1).

89.    Under the VPPA, the term "personally identifiable information" "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."  18 U.S.C. § 2710(a)(3).  In addition, the Third Circuit has held that "personally identifiable information … means the kind of information that would readily permit an ordinary person to identify a specific individual's video-watching behavior."  *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d at 290.

90.    The information disclosed by the Eros Now App constitutes "personally identifiable information" because it allows an ordinary to identify

Plaintiff and Class members, as well as which specific videos were watched by Plaintiff and each Class member. In fact, much of the information disclosed here— Plaintiff's and Class members' full names and the full title of each movie or TV show and TV show episode watched—is identical to "[t]he classic example … [of] a video clerk leaking an individual customer's video rental history." *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d at 290.

91.    Plaintiff and Class members did not provide Defendants with any form of consent—either written or otherwise—to disclose their PII to third parties.

92.    Defendants' disclosures were not made in the "ordinary course of business" as the term is defined by the VPPA. In particular, the Eros Now App's disclosures to WebEngage were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

93.    On behalf of himself and the Class, Plaintiff seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendants to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks a judgment against Defendants, individually and on behalf of all others similarly situated, as follows:

(a)    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b)    For an order declaring that Defendants' conduct violates the VPPA;

(c)    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d)    An award of statutory damages to the extent available;

(e)    For punitive damages, as warranted, in an amount to be determined at trial;

(f)    For prejudgment interest on all amounts awarded;

(g)    For injunctive relief as pleaded or as the Court may deem proper; and

(h)    For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## **JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b)(1), Plaintiff demands a trial by jury of all issues so triable.

Dated: February 16, 2023      Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: *<u>/s/ Yitzchak Kopel</u>*
       Yitzchak Kopel

Yitzchak Kopel
888 Seventh Avenue
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: ykopel@bursor.com

*Attorneys for Plaintiff*